UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHARLIE L. TRIPLETT,

     Plaintiff,

v.

     CASE No. 8:06-CV-1721-T-TGW

CITY OF TARPON SPRINGS,

     Defendant.

_____

## O R D E R

THIS CAUSE came on to be heard upon Defendant City of Tarpon Springs' Motion for Summary Judgment (Doc. 75), and the Plaintiff Charlie Triplett's Memorandum in Opposition (Doc. 79). The plaintiff's claims of procedural due process in counts II and III in connection with the termination of his employment were previously dismissed (Doc. 73). The defendant has moved for summary judgment on the plaintiff's remaining claim, count I, that, by stipulation of the parties, has been limited to a claim of a racially discriminatory termination due to unequal discipline (Doc. 64).

The plaintiff has presented evidence that his immediate supervisor harbored a discriminatory animus towards him. However, the

termination was initiated by the supervisor's superior, and reviewed by the City Manager and a civil service board composed of private citizens. There is no evidence of discriminatory animus at any of those three levels. Accordingly, the plaintiff has failed to adduce evidence from which a reasonable jury could conclude that there was a causal link between the discriminatory animus and the termination. The defendant is therefore entitled to summary judgment.

I.

The plaintiff, Charlie Triplett, who is black, first worked for the defendant, the City of Tarpon Springs, at some point in the 1970s and then returned in July 1979 (Doc. 40, p. 8; Doc. 61, ¶ 7). In 1997, Triplett became the first black supervisor in the history of Tarpon Springs government when he was promoted by Juan Cruz, director of the public services department, to supervise the utilities maintenance section (Doc. 44, ¶¶ 1, 2). In this position, Triplett was responsible for supervising and coordinating maintenance, repairs, and contractual work to ensure that the City's waste collection system remained in good operating condition to prevent sanitary sewer overflow (Doc. 39-2, pp. 72-73).

A reorganization of the public services department occurred in May 2002, and Raymond Page, the wastewater superintendent, became Triplett's immediate boss (Doc. 44, ¶ 4).[1] Page reported to Paul Smith, the assistant public services director, and Smith reported up the chain of command to Cruz (id.).[2]

The immediate circumstances leading to the plaintiff's termination occurred on December 3, 2003, when Triplett failed to follow safety requirements related to trenching and shoring and wearing a hard hat (Doc. 44-2, p. 3[3]). Page arrived on the scene of a sewer project Triplett was supervising and witnessed that, while digging a trench at a depth of at least six feet, Triplett did not use shoring for his safety or for the safety of his staff, as he had been trained to do (id., p. 4).[4] In addition, Triplett and two of his

---

[1]The department was reorganized and Page brought in because the City became non-compliant with requirements of the Florida Department of Environmental Protection (Doc. 39-2, p. 66).

[2]The parties agreed, however, that Paul Smith had no part in the plaintiff's termination.

[3]The page numbers in Doc. 44-2 refer to the docket page number at the top of the page.

[4]Page indicated the trench was at least eighty feet long and that the smallest section was three to four feet wide and about five feet deep (Doc. 39-2, p. 121). The largest part of the trench was six feet wide and nine feet deep (id.).

workers were not wearing hard hats. The Occupational Safety and Health Administration ("OSHA") requires that excavations over five feet use proper shoring equipment (id.).

After observing the violations, Page ordered Triplett and his workers out of the trench (Doc. 75, p. 9). He then questioned Triplett about the safety violations. Triplett maintained that shoring was not necessary because he was digging in the shallow end of the trench, which he believed to be less than five feet (Doc. 44-2, p. 3). Moreover, Triplett explained that he failed to wear a hard hat while in the trench because the hat was too big and would fall off when he bent over (id.). Triplett never apprised his supervisor of the oversized hard hat (id.). At some point in the conversation Triplett said to Page, "you need to be quiet" (id., p. 5). It is controverted whether Triplett's exclamation was uttered within earshot of other workers. Following the incident, Cruz, the director of the department, placed Triplett on administrative leave with pay pending an investigation (Doc. 44, ¶ 5).

Under the City's personnel policies, employee offenses are categorized and assigned disciplinary points along with recommended action (Doc. 43, ¶ 2; Doc. 43-2). An employee who has accumulated sixty points within a twenty-four month period is subject to dismissal (Doc. 43, ¶ 3).

Following the department's investigation, the plaintiff was awarded forty points for failing to use shoring protection and twenty points for telling a supervisor to be quiet, but was given no points for failing to wear his hard hat (Doc. 75, p. 5). On these sixty points alone, Triplett was subject to termination. In the twenty-four month period prior to this incident, however, Triplett was assigned eighty points for other offenses, so that his total reached one hundred forty points.

The first relevant disciplinary action occurred on April 29, 2002, when Cruz witnessed Triplett playing cards during working hours with the workers he was supervising (Doc. 44-2, p. 21). Cruz issued a two-day suspension and assigned twenty disciplinary points. Triplett appealed to Ellen Posivach, the City Manager, who upheld the sanctions (id., p. 23).

Subsequently, the plaintiff requested review of the suspension before the Civil Service Board ("Board") (id., p. 22). The Civil Service Board of Tarpon Springs is composed of five members, who are not employed by the City in any other capacity, official or otherwise, and who are appointed by the Board of Commissioners. They may serve no more than two consecutive two-year terms. Art. IV, § 2-60 Code of Ord., City of Tarpon Springs. The appeal regarding the card-playing was heard by four members

-5-

of the Board and, upon a three-to-one vote, the suspension was reduced by one day, but the assignment of twenty disciplinary points was upheld (Doc. 44-2, p. 26).

The plaintiff also failed within the pertinent period to follow purchasing procedures, for which he was disciplined. On August 20, 2003, Triplett attended a meeting on the City's new credit card procedures (id., p. 28). The City insisted under the new guidelines that employees receive prior approval before making purchases (id., p. 27). Triplett, however, failed to comply with the City's purchasing procedures with respect to items he bought for his staff on October 2, 2003 (id., pp. 29-30). Triplett admitted that he had forgotten about the policy at the time he made the purchases (Doc. 79, p. 16). Consequently, Page recommended to Smith on October 6, 2003, that Triplett receive disciplinary action (Doc. 44-2, p. 29). From all that appears, it was Cruz who awarded Triplett forty disciplinary points for this error.

Next, on December 1, 2003, Gary Shurman of the Engineering Department issued an incident report after visiting a sewer connection project that Triplett was supervising, because the plaintiff had installed the wrong type of pipe (id., pp. 5-6, 35). Specifically, the project plans indicated that C-900 pipe was required in a roadway, but Triplett had ordered, and used, SDR-

35 pipe, which was too thin for installation at a shallow depth (id., p. 36). Cruz determined that Triplett should be awarded twenty disciplinary points for this mistake (Doc. 44, ¶ 8).

Triplett received an annual employee review on September 30, 2003, and his performance was found to be "Satisfactory, with improvement needed in specific areas" (Doc. 44-2, p. 31). The review detailed the areas of deficiency, including planning, leading, decision-making, employee relations, and policy implementation (id., pp. 32-33). As part of the corrective action portion of the evaluation, Triplett was expected to improve, in the future, his ability to cooperate, and communicate, with management, and to understand, and carry out, policies and procedures of the department (id., p. 34). At the bottom of the evaluation, it stated "[i]t is expected that Mr. Triplett will make every reasonable attempt to correct this unacceptable performance or be subject to disciplinary action" (id.). Cruz concluded in January 2004, as part of his decision to terminate Triplett, that Triplett had failed to improve his job performance (Doc. 44, ¶ 11).

After the investigation of the shoring incident concluded, Triplett attended a pre-termination hearing on December 15, 2003, to provide

information in his defense (Doc. 44-2, pp. 2-18). In a January 26, 2004, Memorandum of Disciplinary Action, Cruz indicated that he had determined that, "[b]ased on the totality of the evidence... I have decided to terminate you from employment with the City of Tarpon Springs, effective immediately" (id., pp. 19-21). Cruz concluded that Triplett had not measurably improved and detailed the instances of substandard performance. In the letter of termination, Cruz explained further (id., p. 19):

> Having reviewed your work performance, I have come to the conclusion that you are not working to required standards. This is not a recent event. This department has counseled you and trained you on your performance as a lead technician for some time. Indeed, as part of the most recent evaluation signed by you, a Corrective Action Plan was developed to communicate the areas of necessary improvement in your performance. This was only the most recent of several attempts to open channels of communication to foster understanding of the City's expectations. Despite these efforts, you have failed to meet our expectations.

In particular, Triplett was terminated for accumulating the following points (id., pp. 19-20):

> (1) For failing to follow pre-purchase approval procedures, a level 4 offense, he was assigned forty disciplinary points;

(2) For failing to wear a hard hat, a level 2 offense, he was assigned zero disciplinary points because it was a first offense;

(3) For failing to install the proper pipe, a level 3 offense, he was assigned twenty disciplinary points;

(4) For telling his supervisor to be quiet, a level 3 offense, he was assigned twenty disciplinary points;

(5) For failing to use shoring safety equipment for himself and his staff, a level 4 offense, he was assigned forty disciplinary points;

(6) For failing to achieve a satisfactory performance evaluation, a level five offense, he was assigned no points, but which is considered, by itself, grounds for termination.

Thus, with the twenty disciplinary points Triplett had received from the card-playing incident, his offenses totaled one hundred forty points in a twenty-four month period, over double the amount necessary for termination from employment (id., p. 20).

Triplett hired counsel and appealed to the City Manager (Doc. 43-2, p. 36). He provided written explanations to the charges of violations (id., pp. 37-39). However, Posivach upheld Cruz's determination on February

13, 2004 (id., p. 40). She stated that, "[a]fter reviewing your allegations, speaking with Mr. Cruz, consulting the City's *Personnel Rules and Regulations*, and reflecting on the circumstances, I have determined that the discipline imposed was appropriate, even based on your explanation of the incidents. Therefore, the City upholds your dismissal" (id.). She also informed Triplett of his right to a hearing before the Civil Service Board (id.).

The Civil Service Board held a hearing on September 22 and 23, and October 24, 2004. Triplett was represented by counsel and provided written explanations and answers to the disciplinary charges (id., pp. 41-43). He called ten witnesses and the City called three witnesses during the three-day hearing (id., p. 49). After voting unanimously to sustain Posivach's decision to terminate Triplett, the Board issued a detailed Final Order (id., pp. 44-51). Significantly, they recommended that the City Manager review the possibility of re-hiring Triplett to some other division or department in a non-supervisory capacity (id., p. 51). The City has declined to do so.

The plaintiff filed this federal lawsuit pursuant to 42 U.S.C. 1983. The parties subsequently consented to the exercise of jurisdiction by a United States Magistrate Judge (Docs. 70, 71).

This case has proceeded to the Third Amended Complaint (Doc. 61). The plaintiff's claims in counts II and III, alleging due process violations in connection with the termination of his employment, were previously dismissed because, after the administrative remedies were unsuccessful, the plaintiff did not seek relief in state court. Such claims are foreclosed by McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994) (en banc), cert. denied, 513 U.S. 1110 (1995), due to the availability of adequate post-termination remedies in state court. Consequently, upon the defendant's motion (Doc. 63), counts II and III of the Third Amended Complaint were dismissed (Tr. 73).

The plaintiff in count I, his only remaining claim, alleges that he was discriminated against in a number of different ways (Doc. 61). However, by stipulation between the parties, count I has been limited to a claim of a racially discriminatory termination due to unequal discipline (Doc. 64). Thus, the parties have agreed to the following interpretation of count I (id., p. 1):

> a. The sole claim being made by Plaintiff in Count I of the Third Amended Complaint is a claim for racially discriminatory termination based on Plaintiff's contention that he was subjected to

unequal discipline with respect to his termination from employment from the Defendant.

b. The only adverse employment action alleged in Count I of the Third Amended Complaint is Plaintiff's termination by Defendant.

c. The decision-makers with respect to Plaintiff's termination are Juan Cruz and Raymond Page.

d. Count I of the Third Amended Complaint does not allege claims for racially hostile work environment, retaliation, or violation of due process.

e. All allegations in Count I of the Third Amended Complaint regarding other employment actions that could be construed as adverse employment actions are simply pled as background information and do not constitute operative facts upon which Plaintiff's claim in Count I is based.

The City has filed a motion for summary judgment with respect to count I, as so construed (Doc. 75). After the plaintiff responded (Doc. 79), a hearing was held on the motion.

II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c).

Material facts are those over which disputes "might affect the outcome of the suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. The movant bears the burden of establishing the absence of a dispute over material facts. <u>Reynolds</u> v. <u>Bridgestone/Firestone, Inc.</u>, 989 F.2d 465, 469 (11th Cir. 1993).

Where the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial. <u>United States</u> v. <u>Four Parcels of Real Property</u>, 941 F.2d 1428, 1437-38 (11th Cir. 1991). Alternatively, the movant may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." <u>Id</u>. at 1438. If the moving party does not meet its burden, then the motion for summary judgment will be denied. <u>Id</u>. at 1437.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material

issue of fact that precludes summary judgment." <u>Clark</u> v. <u>Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. <u>United States</u> v. <u>Four Parcels of Real Property</u>, <u>supra</u>, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. <u>Reynolds</u> v. <u>Bridgestone/Firestone, Inc.</u>, <u>supra</u>, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. <u>Id</u>.

### III.

The plaintiff's sole claim, by stipulation, is that he was subjected to unequal discipline when he was terminated from employment on account of his race. As so framed, the plaintiff's claim clearly fails. Thus, the plaintiff has adduced no evidence of any comparator. In particular, he has not pointed to any employee who had anywhere near the number of points the plaintiff had and was not terminated. At most, the plaintiff complains about

-14-

a failure to award points to an employee who was playing dominos on City property and to two others who were not wearing hard hats (Doc. 79, p. 8). Wholly aside from the question whether those matters were brought to Cruz's attention (see Doc. 44, p. 2), they are simply not comparable to the plaintiff's situation of accumulating one hundred forty points in a twenty-four month period. The stipulated claim concerns a termination for an accumulation of points, not a challenge to a particular assessment of points. Thus, the plaintiff has failed to come forward with evidence supporting the claim as stipulated.

The plaintiff, however, has deviated from the stipulation, and the City has not objected to that deviation. The plaintiff's claim of discrimination now rests on racially derogatory statements made by his supervisor, Raymond Page. The most relevant statement, as recalled by Page's former secretary, Laurie Meyers, threatened that Page was "[g]oing to get rid of that N[igger] ... if it was the last thing he did" (Doc. 79-2, p. 2).

In the Eleventh Circuit, to prove intentional discrimination, the plaintiff must establish (1) the employer's discriminatory animus towards the employee based on the employee's protected characteristic; (2) a discharge or other significant change in the terms or conditions of employment; and (3)

-15-

a causal link between the two. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999), cert. denied, 529 U.S. 1053 (2000), citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236 (11th Cir. 1998). At the hearing on the motion, defense counsel focused on the third element.

There is no question that the plaintiff's termination was an adverse employment action. Further, the testimony from Page's former secretary creates, at a minimum, an issue of fact whether Page had a discriminatory animus. Indeed, her testimony would appear to constitute direct evidence of discrimination. See Cisero v. Wal-Mart Stores East, L.P., 2008 WL 2074414 (M.D. Fla. 2008)(unpub. dec.)(where the statement "I hate niggers and I'm going to do everything I can to get rid of that bitch Nakiri" was direct evidence of discrimination); compare Gullatte v. Westpoint Stevens, Inc., 100 F.Supp.2d 1315, 1317-18 (M.D. Fla. 2000)("If you are late again, nigger, I'll fire your ass" was non-direct evidence).

As defense counsel points out, the issue here is whether there is a causal link between Page's discriminatory animus and the plaintiff's termination. Page did not actually terminate the plaintiff and did not have the power to do so. The plaintiff's allegation that Page is a decisionmaker is

-16-

unsupported. He cites no evidence that Page had the ability to decide the fate of Triplett's employment status. "In the termination context, a 'decisionmaker' has the power to terminate an employee, not merely the power to recommend termination." Kamensky v. Dean, 148 Fed. Appx. 878, 879 (11th Cir. 2005)(unpub. dec.), citing Quinn v. Monroe County, 330 F.3d 1320, 1328 (11th Cir. 2003).

Instead, it was Cruz who terminated the plaintiff based, in part, on Page's reports. Moreover, Cruz's decision was reviewed by Posivach, the City Manager, and by the Civil Service Board. As a result, the plaintiff contends, based on the "cat's paw" theory, that Page's discriminatory attitude influenced the true decisionmakers (Doc. 79, pp. 9-11). Under this theory, a non-decisionmaking employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct. Llampallas v. Mini-Circuits, Lab, Inc., supra, 163 F.3d at 1249. "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Stimpson v. City of Tuscaloosa, supra, 186 F.3d at 1332.

However, it is necessary for the plaintiff to show that "the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331. The plaintiff cannot make such a showing.

With respect to Cruz, the plaintiff has not come forward with any evidence that even suggests that Cruz harbored a discriminatory animus, or was biased in any way, toward the plaintiff. The evidence, in fact, indicates the contrary, since it was Cruz who promoted the plaintiff to his supervisory position (Doc. 44, p. 1). See Williams v. Vitro Services Corp., 144 F.3d 1438, 1442-43 (11th Cir. 1998).

Furthermore, in light of the process Cruz employed prior to terminating the plaintiff, there is no probative evidence that Page's discriminatory animus had any meaningful influence on Cruz. The day after the shoring incident, Cruz placed the plaintiff on administrative leave with pay pending an investigation (Doc. 44, p. 2). Eleven days later, Paul Smith, one of Page's superiors, conducted a pre-termination hearing at which the plaintiff was afforded an opportunity to explain the various circumstances for

which discipline could be imposed (Doc. 44-2, Ex. B). While Page was present at that meeting, his participation was limited. The plaintiff, on the other hand, was given a full opportunity to comment on the various incidents, and his responses included criticisms of Page (id.). Cruz reviewed the notes of that hearing before deciding whether to impose discipline on the plaintiff (Doc. 44, p. 2).

Cruz decided to terminate the plaintiff, and explained why in some detail (Doc. 44-2, Ex. C). At the outset, Cruz pointed out that a Corrective Action Plan had been recently developed for the plaintiff, and that the plaintiff's five subsequent derelictions showed that the plaintiff had failed to achieve a satisfactory evaluation (id.). This, by itself, is a ground for dismissal. Importantly, this assessment seems to originate with Cruz, and the plaintiff has not referred to any evidence indicating that Page played a role in it.

In addition, Cruz's decision set forth the specific violations and the disciplinary points assigned for each of them. The disciplinary points totaled one hundred forty, which was more than twice the number needed for dismissal, which was sixty. Significantly, while the plaintiff attempts to

explain away the violations, he cannot demonstrate that they did not occur. Moreover, there were violations constituting eighty points as to which Page had little, or no, role. Thus, Cruz and Smith saw the plaintiff playing cards at work, for which twenty points were assigned; a City engineer was the first to point out the use of improper pipe, for which twenty points were assigned; and the City had pictures showing that the trench was at a depth requiring shoring, for the lack of which forty points were assigned. In addition, as to the remaining two violations, the plaintiff did not dispute that he told Page to "be quiet" regarding the lack of shoring, and that he violated the City policy concerning the use of a credit card. Furthermore, the disciplinary points to be awarded for a particular type of violation are determined by reference to a grid set out in the City's disciplinary guidelines (see Doc. 43-2, p. 4).

Under these circumstances, a jury could not reasonably find that Page's discriminatory animus had any influence on Cruz's decision to terminate the plaintiff. Moreover, even if there were any uncertainty about that conclusion, it would be removed by the two levels of review that the plaintiff was afforded.

After the plaintiff was informed that he was being terminated, the plaintiff retained counsel and, in accordance with the City's procedures, appealed to the City Manager. The plaintiff, through his counsel, submitted a written explanation for the violations set out in Cruz's decision (id., Ex. C).

Posivach, the City Manager, upheld the termination. She stated that, "[a]fter reviewing your allegations, speaking with Mr. Cruz, consulting the City's *Personnel Rules and Regulations*, and reflecting on the circumstances, I have determined that the discipline imposed was appropriate, even based on your explanation of the incidents" (id., Ex. D). While the plaintiff complains that Posivach did no investigation on her own, the plaintiff has not presented any evidence suggesting that Posivach did not undertake the inquiry she stated or did not give the matter her thoughtful consideration.

Further, the plaintiff has not attempted to show, and has not even asserted, that Posivach had a discriminatory animus toward the plaintiff. And importantly, there is no indication that Posivach conferred with Page regarding the plaintiff's termination. Consequently, there is no evidence that Posivach's decision to uphold the termination of the plaintiff was influenced

-21-

in any way by her own discriminatory animus, or by the animus held by Page. Rather, the only reasonable conclusion is that Posivach's determination was based solely upon the plaintiff's remarkable history of disciplinary violations, especially since they were mostly committed in the face of a Corrective Action Plan.

Cruz's independent evaluation, coupled with Posivach's review, would appear to eliminate in the plaintiff's termination any taint from Page's discriminatory animus. In all events, the Civil Service Board's additional review would remove any trace of that taint.

As indicated, the Civil Service Board is composed of private citizens who serve limited terms. The Board in the plaintiff's case conducted an evidentiary hearing over three days at which the plaintiff was represented by counsel and put on witnesses. The Board, in a Final Order, set forth detailed findings that unanimously upheld the termination (id., Ex. F). Notably, the language of the decision indicates that the Board was not unanimous with respect to the violations regarding the "be quiet" statement and the credit card use (id., pp. 6, 7), which reflects the Board members' thoughtful consideration of each charge. The Board commented that the

-22-

shoring violation "is especially serious as it endangers employees' physical safety and can potentially cause great harm or death to the employees involved" (id., p. 7). Finally, the Board recommended that the City Manager review the possibility of re-hiring the plaintiff in a non-supervisory capacity in another division or department (id., p. 8), a recommendation which, although not implemented, contradicts any notion that the Board members harbored a discriminatory animus.

Here, as in Stimpson v. City of Tuscaloosa, supra, the intervention of the Civil Service Board negates the "cat's paw" theory. There is simply no evidence indicating that Page's paw stretches all the way through Cruz and Posivach to influence the Board members.

The plaintiff makes the conclusory assertion that the Board simply rubber-stamps the City's termination decisions. The only evidence he presents in support of this contention is a statement by Human Resources Director Jane Kniffen, who said that, since she began working for Tarpon Springs, the Board has upheld all discipline recommendations and had modified a recommendation only one time. However, at the time of the hearing, Kniffen worked for the City for just four and a half years, and the

-23-

plaintiff brought forth no evidence of the number of hearings the Board had held during her tenure (Doc. 39-2, p. 39). Furthermore, the Board (although not the same members) had previously reduced the plaintiff's two-day suspension for playing cards to one day (Doc. 79-2, p. 29).

These circumstances do not support a claim of rubber-stamping. This claim, moreover, ignores the fact that the Board is regularly changing due to term limits. In all events, an eight-page detailed decision plainly does not fall in the category of rubber-stamped.

The plaintiff also asserts that "[l]ies by Mr. Page were considered by the Civil Service board [sic] and this perjury infected the results" (Doc. 79, p. 7). This assertion is unsupported by any specification. Thus, the plaintiff has not identified the purported lies Page told the Board, much less demonstrated that the statements were false.

Furthermore, as previously explained, the violations, in general, did not turn on choosing Page's version of what happened over the plaintiff's. Therefore, the plaintiff also needed to demonstrate that any alleged false statement by Page to the Board was material.

In any event, even if Page did make false statements to the Board, that would not establish the plaintiff's claim. After all, the Board conducted an evidentiary hearing and it was the Board's province to determine the credibility of the witnesses. Accordingly, if the Board honestly believed Page's testimony – regardless of whether it was false or not – and based its decision on Page's version of the plaintiff's violations, the decision would not be predicated on a discriminatory animus, but upon the conclusion that the plaintiff had committed the violations. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). While, in that situation, the Board's conclusion might be mistaken, it would not be discriminatory. Id.

For these reasons, the plaintiff's allegation that Page lied to the Board does not support his claim.

The plaintiff next argues that the Board did not adequately investigate the plaintiff's case because the City Attorney, John Hubbard, acted as legal counsel to the Board and had a conflict of interest. This claim is baseless. Hubbard had nothing to do with the plaintiff's termination. Moreover, there is no evidence that Page influenced Hubbard in any way. Accordingly, Hubbard's actions do not support a finding of discrimination.

-25-

In short, the plaintiff's reliance on the "cat's paw" theory fails. In view of the independent evaluation by Cruz, followed by review by the City Manager and the Civil Service Board, a reasonable jury could not find that Page's discriminatory animus influenced the plaintiff's termination.

Finally, it is noted that, near the end of his memorandum, the plaintiff throws in an assertion that the plaintiff was fired so that a white employee, James Vlandingham, could be brought in to replace the plaintiff as supervisor (Doc. 79, p. 14). This is not reasonably within the stipulated allegations of count I, which, as agreed, limited count I to a claim of a racially discriminatory termination due to unequal discipline. The "cat's paw" theory was not within that claim either, but since the defendant addressed such a theory in its memorandum, I was prepared to consider it.

The defendant, however, had no occasion to consider a claim regarding Vlandingham and, accordingly, did not do so. Under these circumstances, such a claim will be deemed waived in light of the stipulation, since it would be unfair to the defendant to consider an unanticipated claim.

It is appropriate to add that the claim in any event would fail. As previously explained, the defendant has provided a legitimate non-

discriminatory reason for the plaintiff's termination, and the plaintiff has not shown that that reason is pretextual. See, e.g., Mayfield v. Patterson Pump Co., 101 F.3d 1371 (11th Cir. 1996).

It is, therefore, upon consideration

ORDERED:

That Defendant's Motion for Summary Judgment (Doc. 75) be, and the same is hereby, **GRANTED**. The Clerk of Court shall accordingly enter judgment against the plaintiff, and in favor of the defendant, dismissing the lawsuit. The Clerk shall thereupon CLOSE this case.

DONE and ORDERED at Tampa, Florida, this 30th day of July, 2009.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE